United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MIESHA LAMELL,

Plaintiff,

v.

CAROLYN W. COLVIN, Acting Commissioner of Social Security,

Defendant.

Case No.: 12-05013-KAW

ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Miesha Lamell seeks judicial review, pursuant to 42 U.S.C. § 405(g), of the Commissioner's final decision, and the remand of this case for further proceedings. Pending before the Court is Plaintiff's motion for summary judgment. Having considered the papers filed by the parties, and for the reasons set forth below, the Court grants Plaintiff's motion for summary judgment, and remands the case for further proceedings consistent with this order.

## I. BACKGROUND

In March 2009, Plaintiff filed a Title XVI application for Supplemental Security Income ("SSI") Benefits. Administrative Record ("AR") 92, 152. Plaintiff's application alleges a disability onset date of approximately January 1, 2001. *Id.* at 152, 161. Plaintiff's claim was initially denied by the state agency on May 14, 2009. *Id.* at 92, 94, 152. Plaintiff filed a Request for Reconsideration in June 2009. *Id.* at 107, 153. Plaintiff's Request for Reconsideration was denied on July 31, 2009, AR 100-104, 153, and Plaintiff filed a Request for Hearing on August 27, 2009. *Id.* at 105-106, 153. A

hearing was held before Administrative Law Judge Timothy G. Stueve on December 7, 2010. *Id.* at 36.

Plaintiff is thirty-two years old. She has three children and is married, although she and her husband are separated and live apart due to Plaintiff's symptoms of insomnia and irritability resulting from her mental and physical impairments. AR 60, 239-240. As a teenager, Plaintiff worked stocking books in the library and, as an adult, has held several short-term jobs as a caregiver, a clerical worker, a cashier, and a van driver for Alameda County Transit. AR 63, 183, 196. Plaintiff indicated in a disability report that she stopped working on December 21, 2004, "due to [her] condition," and at her hearing testified that she had trouble maintaining employment and has been fired from at least one job because her migraines frequently caused her to miss work and she had trouble getting along with coworkers and supervisors. AR 182, 85.

From 2008 to 2010, Plaintiff has been seeing a primary care doctor who diagnosed her with migraines and prescribed medication to treat her pain and insomnia. AR 305, 306, 307, 309, 803. A neurologist has also diagnosed Plaintiff with a "predominantly mixed headache, vascular and muscle contraction in nature." *Id.* at 359-361. Plaintiff continues to make monthly visits to a neurologist since December 2010. *Id.* at 653-659.

Plaintiff's migraines have required her to seek medical treatment at the Emergency Departments of St. Rose and Washington Hospitals. Between February 4, 2006 and January 26, 2012, Plaintiff was seen at least 36 times in the Emergency Departments for migraine headaches and associated symptoms, including nausea, vomiting, photophobia, phonophobia, and syncopal episodes. *Id.* at 310-357, 384-531, 557-30, 660-709, 710-761.

From July 2009 until February 2011, Plaintiff was treated by Dr. Arifa Rahman, who diagnosed Plaintiff with depressive disorder and psychotic disorder. AR 260-268, 363-365, 371-377. After having seen and evaluated Plaintiff on at least seven separate occasions, Dr. Rahman opined that Plaintiff has an extreme limitation, defined as having no useful ability to function in the specified area. AR 363. Dr. Rahman's findings include that Plaintiff is limited in her ability to understand, remember, and carry out detailed instructions, maintain regular attendance, complete a normal workday and workweek uninterrupted by psychologically-based symptoms, interact appropriately

with the general public, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and respond appropriately to changes in the work setting. AR 363-365.

In a February 2, 2011 decision, the ALJ found that Plaintiff was not disabled. AR 36-53. On April 4, 2011, Plaintiff requested that the Appeals Council review the ALJ's decision, and submitted additional evidence to the Appeals Council. *Id.* at 16-17. The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied review on July 24, 2012. AR 1-8. Plaintiff now seeks judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g).

## II. LEGAL STANDARD

A court may reverse the Commissioner's denial of disability benefits only when the Commissioner's findings are 1) based on legal error or 2) are not supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999). Substantial evidence is "more than a mere scintilla but less than a preponderance"; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* at 1098; *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996). In determining whether the Commissioner's findings are supported by substantial evidence, the Court must consider the evidence as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. *Id.* "Where evidence is susceptible to more than one rational interpretation, the ALJ's decision should be upheld." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008).

Under Social Security Administration ("SSA") regulations, disability claims are evaluated according to a five-step sequential evaluation. *Reddick v. Chater*, 157 F.3d 715, 721 (9th Cir. 1998). At step one, the Commissioner determines whether a claimant is currently engaged in substantial gainful activity. *Id.* If so, the claimant is not disabled. 20 C.F.R. § 404.1520(b). At step two, the Commissioner determines whether the claimant has a "medically severe impairment or combination of impairments," as defined in 20 C.F.R. § 404.1520(c). *Reddick*, 157 F.3d 715 at 721. If the answer is no, the claimant is not disabled. *Id.* If the answer is yes, the Commissioner proceeds to step three,

and determines whether the impairment meets or equals a listed impairment under 20 C.F.R. § 404, Subpart P, Appendix 1. 20 C.F.R. § 404.1520(d). If this requirement is met, the claimant is disabled. *Reddick*, 157 F.3d 715 at 721.

If a claimant does not have a condition which meets or equals a listed impairment, the fourth step in the sequential evaluation process is to determine the claimant's residual functional capacity ("RFC") or what work, if any, the claimant is capable of performing on a sustained basis, despite the claimant's impairment or impairments. 20 C.F.R. § 404.1520(e). If the claimant can perform such work, she is not disabled. 20 C.F.R. § 404.1520(f). RFC is the application of a legal standard to the medical facts concerning the claimant's physical capacity. 20 C.F.R. § 404.1545(a). If the claimant meets the burden of establishing an inability to perform prior work, the Commissioner must show, at step five, that the claimant can perform other substantial gainful work that exists in the national economy. *Reddick,* 157 F.3d 715 at 721. The claimant bears the burden of proof in steps one through four. *Bustamante v. Massanari*, 262 F.3d 949, 953-954 (9th Cir. 2001). The burden shifts to the Commissioner in step five. *Id.* at 954.

**III. THE ALJ'S DECISION**

The ALJ found at step one that Plaintiff had not engaged in substantial gainful activity since the date of her application. AR 41. At step two, that Plaintiff's only severe impairment was depression. AR 41. At step three, the ALJ concluded that the Plaintiff did not have an impairment or combination of impairments that met or equaled a listed impairment in 20 C.F.R. § 404, Subpart P, Appendix 1. AR 44-45. At step four, the ALJ concluded that Plaintiff did not have any past relevant work and has the RFC to perform a full range of work but with some nonexertional limitations as to "simple, routine, and repetitive tasks involving only simple work related decisions with few, if any, work place changes." AR 45. After noting Plaintiff's reported difficulties with memory, completing tasks, concentration , understanding, fatigue, sleep difficulties, and irritability, the ALJ considered that Plaintiff's sporadic work history prior to the alleged disability onset date, in his mind, "raises a question as to whether her continuing unemployment actually is due to her depression." *Id.* at 46-47. The ALJ found that Plaintiff is able to care for her children, lives alone, and is able to drive and shop,

and "generally her daily activities are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations. *Id.* at 47.

Plaintiff was born in 1980, and was 28 years old on the date the application was filed, which is defined as a younger individual (age 18-49). *Id*. at 48. She has a limited education and is able to communicate in English. *Id.* Transferability of job skills was is not an issue because the claimant does not have past relevant work. *Id.* Considering Plaintiff's age, education, work experience, and residual functional capacity, there were jobs existing in significant numbers in the national economy that Plaintiff could perform. *Id.* Therefore, Plaintiff was not disabled within the meaning of the Social Security Act. *Id.* at 49.

## IV. DISCUSSION

Plaintiff makes five arguments in her motion for summary judgment: (1) that the ALJ failed to include Plaintiff's migraine headaches and psychotic disorder among Plaintiff's severe impairments; (2) that the ALJ rejected the opinions of Plaintiff's treating sources without clear and convincing or specific and legitimate reasons; (3) that the ALJ discredited Plaintiff's testimony regarding her symptoms without clear and convincing reasons; (4) that the ALJ failed to include all of Plaintiff's limitations in determining her residual functional capacity ("RFC"); and (5) relied on vocational expert ("VE") testimony based on an improper hypothetical to find Plaintiff not disabled. *See* Pl.'s Mot. at 1, 6-25.

The Court will address each argument in the order of the five-step evaluation. There is no dispute that Plaintiff is not is currently engaged in a substantial gainful activity, and so the analysis proceeds to step two to determine whether she is disabled.

### A. The ALJ erred by failing to include migraine headaches and psychotic disorder among Plaintiff's severe impairments in Step Two.

Plaintiff argues that the ALJ erred by failing to include migraine headaches and her psychotic disorder as severe impairments at step two. *See* Pl.'s Mot. at 7-9. The second step of the sequential evaluation process is the determination of whether the claimant's impairment or combination of impairments is "severe". *Reddick*, 157 F.3d 715 at 721. Under the de minimis step two standard, "an impairment or combination of impairments may be found not severe *only if* evidence establishes a

slight abnormality that has no more than a minimal effect on an individual's ability to work." *Webb v. Barnhart*, 433 F.3d 683, 686-87 (9th Cir. 2005). Step two is a “de minimis screening device [used] to dispose of groundless claims.” *Id.* at 687 (quoting *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996). An ALJ may only find that a claimant lacks a medically severe impairment or combination of impairments only when the conclusion is based on “clearly established medical evidence.” *Webb*, 433 F.3d at 687.

Plaintiff argues that the record is replete with evidence that her migraines interfere with her ability to complete basic work activities and satisfies the step two test. Plaintiff’s primary care physicians, Dr. Bruce Thompson and Dr. Htay Win, repeatedly diagnosed her with migraines and prescribed her pain medication to treat the resulting pain. AR 305-309, 540, 543, 632-638. This, coupled with Plaintiff’s consistent testimony regarding her symptoms and the frequency of her trips to the emergency room, [1] suggests that Plaintiff’s migraines are not controlled. Despite this evidence, the ALJ’s found that Plaintiff’s frequent emergency room visits, which resulted in Plaintiff being prescribed pain medication and being released, “indicat[ed] that her symptoms are usually well controlled with pain medications....” AR 43. Plaintiff’s regular migraines, however, could understandably result in an inability to maintain a regular work schedule, among other limitations, and may have a more than minimal effect on her ability to perform basic work activities. In any case, while Plaintiff’s migraines alone may not be sufficient for a finding that she is disabled, they qualify as a severe impairment at step two.

Evidence also supports a finding that Plaintiff’s psychotic disorder meets the de minimis step two test, including a Medical Source Statement completed by Plaintiff's treating psychiatrist, Dr. Rahman. The statement indicates that Plaintiff’s mental impairments result in extreme limitations in social interactions and adaptation, and moderate limitations in activities of daily living. AR 363-65. As such, Plaintiff’s psychotic disorder has more than a minimal effect on her ability to work.

///

[1] Between February 4, 2006 and January 26, 2012, Plaintiff was seen at least 32 times in the Emergency Departments of St. Rose and Washington Hospitals for migraine headaches and associated symptoms. AR 312-316, 322-338, 346-357, 384-392, 413-420, 428-462, 470-491, 497-501, 525-531, 559-580, 664-686, 713-748.

If the plaintiff's subjective complaints correspond with his doctors' diagnoses, and the doctors did not dismiss plaintiff's complaints as unfounded, there is "no inconsistency sufficient to doom his claim as groundless under the de minimis standard of step two." *Webb*, 433 F.3d at 688. Plaintiff argues that because her subjective complaints regarding her migraines are consistent with her doctors' diagnoses, the ALJ erred by discounting her complaints at step two.

Defendant contends that even if the ALJ erred in not finding Plaintiff's migraines and psychotic disorder severe at step two, any error in designating specific impairments as severe at that juncture is harmless since the ALJ continued the sequential analysis past step two and assessed limitations based on the Plaintiff's mental impairments. *Burch v. Barnhart*, 400 F.3d 676, 682 (9th Cir. 2005). Defendant argues that step two was resolved in Plaintiff's favor because the ALJ determined Plaintiff had a medically determinable severe impairment, depression. The ALJ continued the sequential evaluation and considered the functional effect of all of Plaintiff's impairments, severe and non-severe. Therefore, Defendant argues that identifying Plaintiff's migraines and psychotic disorder as severe or non-severe is irrelevant.

To the contrary, any exclusion of severe impairments at step two affects the ALJ's determination of how the combination of a plaintiff's other impairments affected her residual functional capacity to perform work at step four. If an ALJ finds a severe impairment at step two, that impairment must be considered in the remaining steps of the sequential analysis. *Cheng v. Astrue*, No. C10–03605 HRL, 2013 WL 818548, at *4 (N.D. Cal. Mar. 5, 2013). In this instance, the ALJ disregarded Plaintiff's psychotic disorder at step two, and so he was unable to consider the combined effect of all of Plaintiff's limitations when determining her RFC. Further, the ALJ's consideration of Plaintiff's migraine headaches essentially ended at step two when he discounted Plaintiff's testimony and found that she did not suffer from a severe impairment.

Accordingly, the ALJ erred at step two of the disability determination by failing to include Plaintiff's migraines and psychotic disorder as severe impairments.

///

///

///

United States District Court
Northern District of California

**B. The ALJ erred by rejecting the opinions of Plaintiff's treating medical sources.**

The opinions of treating medical sources may be rejected only for clear and convincing reasons if not contradicted by another doctor and, if contradicted, only for specific, legitimate reasons supported by substantial evidence. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).

Psychologists and psychiatrists, in diagnosing mental illness, often make five different sub-diagnoses, on what they call "Axes." *Williamson v. Astrue*, No. EDCV 12–00364–CW, 2013 WL 141544, at *4 n. 4 (C.D. Cal. Jan. 10, 2013). Axis V measures the Global Assessment of Functioning ("GAF"). *Id.* The GAF is a scale ranging from zero to 100, used to rate social, occupational and psychological functioning on a hypothetical continuum of mental health. *Id.* The GAF score is a subjective determination that represents the clinician's judgment of the individual's overall level of functioning. *Sigmon v. Kernan*, No. CV 06–5807 AHM (JWJ), 2009 WL 1514700, at *9 n.3 (C.D. Cal. May 27, 2009). A GAF score may help an ALJ assess mental residual functional capacity, but is not raw medical data. People with a GAF score of 41 to 50 have "serious symptoms" or any serious impairment in social, occupational or school functioning. *Williamson v. Astrue*, No. EDCV 12–00364–CW, 2013 WL 141544, at *4 n.5 (C.D. Cal. Jan. 10, 2013). By contrast, a GAF score of 51 to 60 indicates only "moderate difficulty in functioning." *Atkinson v. Astrue*, No. 2:10–cv–02072–KJN, 2011 WL 4085414, at *10 (E.D. Cal. Sept. 13, 2011). People in that category may have flat affects, circumstantial speech, occasional panic attacks, few friends, or conflicts with coworkers. *Id.* A GAF score of 61 to 70 indicates some mild symptoms or some difficulty in social, occupational or school functioning but generally functioning well with some meaningful interpersonal relationships. *Sigmon v. Kernan*, No. CV 06–5807 AHM (JWJ), 2009 WL 1514700, at *9 n.3 (C.D. Cal. May 27, 2009).

Dr. Rahman assigned Plaintiff a GAF of 50 to 55, indicating moderate to serious symptoms, on her visits in July 2009 (55) October 2009 (50), December 2009 (55), and January 2010 (50). Plaintiff's GAF score was consistently assessed at a level indicating moderate or serious symptoms at all visits to Pathways to Wellness, with the exception of February 2010, at which Plaintiff was assigned a GAF of 65, but that score was assigned by a nurse practitioner, not Dr. Rahman. AR 369, 618, 605, 603, 620, 616. When Plaintiff was seen by that same nurse practitioner in March 2010, she was not assigned a GAF score. AR 367.

The ALJ found that the opinion of Plaintiff's treating psychiatrist, Dr. Rahman, was not supported by medically acceptable clinical and laboratory diagnostic techniques and was inconsistent with other substantial evidence in the record, including Dr. Rahman's own treatment notes. AR 47, 262-268. The ALJ interprets Dr. Rahman's notes as "assessing only mild to moderate symptoms." AR 47. According to Dr. Rahman's treatment notes, however, Plaintiff was consistently assessed to have moderate or serious functional limitations based on the GAF scores. AR 371, 373, 375, 381. Therefore, these reports are consistent with Dr. Rahman's January 19, 2010 Medical Source Statement indicating that Plaintiff has marked to extreme limitations in the areas of understanding and memory, sustained concentration and persistence, social interaction and adaptation, and moderate limitations in activities of daily living. AR 363-365.

The ALJ found the results of the January 19, 2010 assessment surprising, considering that in December 2009, Plaintiff reported she was doing better with reduced anxiety and depression, sleeping better, and her mood was stable, with good response to medications. AR 47, 373. According to the record, Plaintiff's score improved from 50 to 55, but then went back down to 50 in January 2010. Assuming that the GAF scores are accurate, at best, Plaintiff appears to have moderate difficulty in social, occupational or school functioning. At worst, she has a serious impairment.

The ALJ then pointed to Plaintiff's apparent improvement in February and March 2010 when her GAF score was assessed at 65, indicating only mild symptoms. AR 47. As provided above, Plaintiff did not actually receive a GAF score in March 2010, as indicated by the blank space next to "Axis V Current Score". *See* AR 367. Further, the February 2010 GAF was assessed by a nurse practitioner rather than Dr. Rahman. AR 369.

In addition to Plaintiff's restrictive GAF scores, the Pathways to Wellness records consistently contain assessments that Plaintiff's prognosis is guarded or fair, include repeated prescriptions for heavy psychotropic medications, document multiple abnormal mental status exams, and note a number of serious symptoms, including depression, anxiety, anhedonia, insomnia, auditory hallucinations, irritability, isolating behavior, poor concentration, and decreased appetite. AR 259-268, 366-383, 601-608, 612-628.

An ALJ cannot reach a conclusion first, and then attempt to justify it by ignoring competent evidence in the record that suggests an opposite result. *Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir. 1984). Plaintiff argues that the ALJ selectively highlighted portions of the treatment notes that support the ALJ's rejection of Dr. Rahman's assessment, while ignoring portions consistent with Dr. Rahman's more restrictive January 2010 assessment. A review of the administrative records supports Plaintiff's contention that Dr. Rahman's opinion does not contradict other medical evidence in the record. Further, the ALJ's rejection of Dr. Rahman's opinion appears to be based on a mischaracterization of the evidence and an aberrant GAF score assigned by a nurse practitioner instead of by Plaintiff's treating physician. It is not clear why the ALJ gave more weight to that one conflicting score over those of Dr. Rahman. Therefore, the Court finds that the ALJ rejected Dr. Rahman's opinion without clear and convincing reasons, and the rejection of the totality of Dr. Rahman's assessments—including the January 2010 assessment—were in error.

**C. The ALJ erred by failing to identify which portions of Plaintiff's testimony were not credible and for failing to provide specific, clear and convincing reasons for rejecting Plaintiff's testimony.**

In evaluating the credibility of a claimant's testimony regarding subjective pain, an ALJ must engage in a two-step analysis. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035–36 (9th Cir.2007). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Id.* at 1036. The claimant is not required to show that her impairment "could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom." *Id.* If the claimant meets the first test and there is no evidence of malingering, the ALJ can only reject the claimant's testimony about the severity of the symptoms if he gives "specific, clear and convincing reasons" for the rejection. *Id.* The ALJ must specify what testimony is not credible and identify the evidence that undermines the claimant's complaints; general findings are insufficient. *Burch v. Barnhart*, 400 F.3d 676, 680 (9th Cir. 2005).

Plaintiff argues that the ALJ never clearly identified which portions of her testimony he rejected, instead making a general statement that Plaintiff's "allegations of disabling pain" and her "testimony regarding her symptoms" are not "fully credible or reliable." AR 48. Plaintiff argues that

this is the kind of general statement that the Ninth Circuit has held to be erroneous. *Lester*, 81 F.3d 821 at 834 (holding that the ALJ's statement that the "claimant's testimony regarding his current pain [is] exaggerated, not credible, and not supported by credible medical evidence" was erroneously general).

Despite Plaintiff's contention to the contrary, the ALJ did specify which parts of Plaintiff's testimony he found not credible. The ALJ offered the following reasons or sources to discredit Plaintiff's testimony: (1) certain statements from Psychological Consultative Examiner Dr. Jasdeep S. Aulakh's report; (2) selected portions of Pathways to Wellness records from 2009 and 2010; (3) Plaintiff's "sporadic work history prior to the alleged disability onset date;" (4) Plaintiff's purported activities of daily living; (5) Plaintiff's alleged failure to report her psychotropic medications when seen in the Emergency Department; (6) Plaintiff's continued smoking despite asthma symptoms; and (7) neurological testing results. AR 47, 76.

Even if the ALJ identifies the specific testimony he finds not credible, in order to reject a claimant's subjective complaints, an ALJ must give "specific, cogent reasons for the disbelief." *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995). Without affirmative evidence showing that the claimant is malingering, the ALJ's reasons for rejecting the claimant's testimony must be clear and convincing. *See id.*; *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999). The ALJ resolves questions of credibility and conflicts in the testimony. *See Yuckert v. Bowen*, 841 F.2d 303, 307 (9th Cir.1988). Accordingly, the Court will individually address below each reason the ALJ used to discount Plaintiff's testimony.

1. Dr. Aulakh's Consultative Examination Report

Defendant argues that objective evidence, including a psychological consultative examination and neurological testing, did not support Plaintiff's alleged limitations. Def.'s Opp'n at 8; AR 46-47, 293-97, 359-61. Plaintiff underwent a psychological consultative examination with Dr. Jasdeep S. Aulakh on April 27, 2009. Dr. Aulakh found Plaintiff was able to "endure schedules" and "go back and forth from work." AR 297.

Plaintiff argues that Dr. Aulakh's report as a whole suggests a more limited RFC than the one adopted by the ALJ. (Pl.'s Mot. at 15.) Dr. Aulakh's report does not indicate that Plaintiff is capable

of full-time competitive employment and the report is consistent with Plaintiff's testimony regarding her symptoms and limitations. *See* AR 294-95. Further, Dr. Aulakh assigned Plaintiff with a GAF score of 58 indicating moderate difficulty in functioning. AR 297. Also, Plaintiff was diagnosed with moderate to severe psychosocial stressors that were severe enough to warrant a diagnosis of personality disorder not otherwise specified (NOS). *Id.*

Additionally, Plaintiff contends that "the ALJ cites to Dr. Aulakh's statement that Plaintiff 'denied any pervasive symptoms of depression, mania, or psychotic spectrum illness,' while completely ignoring the fact that Plaintiff did report many symptoms commonly associated with depression and mania during the examination". (Pl.'s Mot. at 15.) It is unclear why the ALJ found that this called Plaintiff's credibility into question given that the ALJ determined that Plaintiff's depression was a severe limitation that satisfied step two of the sequential evaluation process. AR 41. Further, Dr. Aulakh's report is replete with Plaintiff's self-reported symptoms that are commonly associated with depression, including difficulty finishing tasks, feeling easily overwhelmed, difficulty sustaining attention, and lost interest in activities and hobbies she used to enjoy. AR 294, 297.

Taken in its entirety, Dr. Aulakh's functional assessment does not call into question Plaintiff's testimony about her disabling conditions, but rather supports a finding that Plaintiff's RFC is more limited than the one adopted by the ALJ.

2. Pathways to Wellness Records

The ALJ relies on psychiatric records from Pathways to Wellness to support a finding that Plaintiff is not fully credible. *See* AR 47.

Although it is within the power of the ALJ to make findings concerning the credibility of a witness and to weigh conflicting evidence, he cannot reach a conclusion first, and then attempt to justify it by ignoring competent evidence in the record that suggests an opposite result. *Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir. 1984).

The ALJ offers a summary of the Pathways to Wellness records that selectively highlights portions of the records that support the ALJ's RFC assessment, while ignoring the portions that are consistent with Plaintiff's statements regarding irritability, fatigue, insomnia, auditory hallucinations, and diminished concentration. AR 47.

Taken in its totality, the Pathways to Wellness records indicate that Plaintiff suffers from depression and a psychotic disorder that results in moderate to severe symptoms and actually supports rather than detracts from Plaintiff's statements regarding her mental impairments and related symptoms. *See* AR 259-268, 366-383, 601-608, 612-628.

3. Plaintiff's Sporadic Work History

The ALJ stated that Plaintiff's "sporadic work history prior to the alleged disability onset date raises a question as to whether [Plaintiff's] continuing unemployment actually is due to her depression." AR 47.

In response, Plaintiff argues that this type of inferential credibility determination is exactly what the Ninth Circuit rejected in *Lingenfelter*. 504 F.3d 1028, 1036-1037. (holding that "after the relevant time period during which [Plaintiff] claimed to be disabled and facing difficult economic circumstances, tried to work for nine weeks and, because of his impairments, failed, is not a clear and convincing reason for concluding that his symptoms could not have precluded him from maintaining employment during the relevant time period.")

The ALJ made no finding of malingering and likely cannot construct one by raising unsubstantiated questions as to Plaintiff's motivations. Moreover, this inference is contradicted by Plaintiff's statements throughout the record that she has suffered from migraines since she was 11 or 12 years old and has experienced symptoms of depression since she was very young. AR 78, 174, 262, 475, 482. Plaintiff's reported symptoms as a child could potentially support an earlier disability onset date. Further, Plaintiff was only 21 years old at the time of her alleged onset date, which may further explain a less than consistent work history. AR 60.

4. Plaintiff's Activities of Daily Living

Despite the fact that the ALJ found that the Plaintiff's medically determinable impairment reasonably could be expected to cause the alleged symptoms, the ALJ determined that Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms were not credible to the extent they were inconsistent with his RFC assessment that she could do simple, routine, repetitive tasks. AR 46. The ALJ found that Plaintiff's activities of daily living evinced an ability to do work consistent with his RFC finding. AR 42-43, 47. Specifically, the ALJ found

Plaintiff was able to care for her children, including a disabled child, lived alone, and was able to drive and grocery shop. AR 47.

Daily activities may form the basis for an adverse credibility finding where the plaintiff's activities: (1) contradict his other testimony; or (2) meet the threshold for transferable work skills. *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007) (certain activities of daily living may be the basis for an adverse credibility finding "if a claimant is able to spend a substantial part of his day engaged in pursuits involving the performance of physical functions that are transferable to a work setting."). The Ninth Circuit recognizes that "many home activities are not easily transferable to what may be the more grueling environment of the workplace, where it might be impossible to periodically rest or take medication." *Id.*

The record indicates that between Plaintiff's frequent migraines, Plaintiff is capable of performing some activities of daily living, and, therefore, statements about her symptoms and limitations do not contradict her reported activities of daily living. Furthermore, Plaintiff's limited activities of daily living may not meet the threshold of transferable work. Plaintiff indicates that her migraines come at random, require that she lay down, and interfere with her ability to cook, clean, read, and socialize. AR 81-82, 173-180. When asked to describe a typical day, Plaintiff testified that "I practically just lay around all day and try to sleep as much as I can, when I can." AR 75. Plaintiff further testified that she receives help with household chores from her 13-year-old son and her cousin who lives nearby. AR 75.

Plaintiff's ability to complete some household activities did not contradict her other testimony nor are they necessarily transferable to a work setting. Accordingly, the ALJ's reasons for rejecting Plaintiff's testimony were not clear and convincing.

5. Smoking Despite Asthma and Failure to Report Medications

The ALJ noted that Plaintiff did not report all of her medications prescribed by Dr. Rahman when she was seen for her headaches. The ALJ concluded that therefore, Plaintiff may not have been taking the medications as ordered or possibly withheld information from her treating source in an attempt to obtain pain medication. The ALJ reasoned that although the inconsistent information provided by the Plaintiff may not have been an intention to mislead, nevertheless it suggests that the

information provided by the Plaintiff may not be entirely reliable. He also found that the Plaintiff's continuing to smoke despite asthma symptoms was also inconsistent.

The ALJ's suggestion that this behavior is indicative of drug-seeking behavior or medication noncompliance is not clear and convincing, does not appear to be supported by the record, and amounts to speculation. Further, Plaintiff's continued smoking despite experiencing asthma symptoms is not a clear and convincing reason to find that Plaintiff's reports of mental health and migraine symptoms are not credible. Plaintiff testified that her asthma had not affected her for quite some time until an acute attack in September 2010, and further testified that her occasional smoking does not seem to exacerbate her asthma. AR 70.

In regard to Plaintiff's smoking and reporting medication, the ALJ did not identify evidence that undermines claimant's complaints. In reality, people forget what medications they are taking and smoking is an addiction. Accordingly, the ALJ’s reasons for rejecting Plaintiff’s testimony were not clear and convincing.

6. Neurological Testing

The ALJ points to the lack of conclusive neurological testing to discredit Plaintiff's testimony regarding the symptoms and limitations resulting from her migraines. The lack of conclusive neurological testing, however, is irrelevant to Plaintiff’s migraine diagnosis and has no bearing on her testimony regarding her subjective pain and other symptoms.

Once the ALJ concluded that Plaintiff’s medically determinable impairments could reasonably be expected to cause the alleged symptoms, he was precluded from requiring Plaintiff to produce objective evidence of the degree or severity of her symptoms. *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998)(“Once the claimant produces medical evidence of an underlying impairment, the Commissioner may not discredit the claimant’s testimony as to the severity of symptoms merely because they are unsupported by objective medical evidence.”) Further, it is the uncontroverted opinion of Plaintiff’s treating physicians that she meets the diagnostic criteria for migraine headaches, which does not require neurological testing in order to obtain or confirm a migraine diagnosis. Accordingly, the ALJ’s rationale for rejecting Plaintiff’s testimony was improper.

///

7. Additional Support

Judicial review is limited to the reasons the ALJ cited in the adverse credibility decision, and the court cannot affirm the finding based on reasons or evidence that the ALJ did not discuss. *Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003).

Despite this limitation, Defendant seeks to include additional facts to support the ALJ's adverse credibility finding on the grounds that the Commissioner may provide "additional support" for the ALJ's conclusions even if the ALJ did not refer to the support in question. *Warre v. Comm'r of Soc. Sec.*, 439 F.3d 1001, 1005 n.3 (9th Cir. 2006). Unlike the instant case, *Warre*, did not involve "invent[ing] a new ground of decision" because while "the ALJ did not cite the [document,] the medical expert who testified at the hearing did, and the ALJ clearly credited the expert's and the Commissioner's interpretation...." *Id.*

Here, Defendant attempts to introduce evidence that Plaintiff's primary care physician, Dr. Htay Win, frequently assessed normal physical findings, such that Plaintiff's symptoms were controlled, and that Plaintiff was able to function despite daily headaches. (Def.'s Opp'n at 9.) The records, however, are not as persuasive as Defendant would have the Court believe. On April 19, 2011, Plaintiff reported to Dr. Win that her headaches were "continuous day and night every day" and that she was "unable to get a job." AR 638. In his treatment notes, Dr. Win opined that he doubted this statement. *Id*. On that same date, Dr. Win filled out a "Pain Report" at Plaintiff's request, which stated that he was unsure whether Plaintiff's pain rendered her unable to work, but that her headaches were relieved by medication. AR 643-644. At that time, Dr. Win confirmed Plaintiff's migraine diagnosis. AR 638, 643. On December 16, 2011, Dr. Win saw Plaintiff, who he again referred to Dr. Vicky Economou, a neurologist, for a second opinion. AR 634. Dr. Win's treatment notes further state his opinion that "[patient] probably able to work as normal when there is not acute attack present." *Id*. Plaintiff visited Dr. Win again on December 30, 2011, and Dr. Win noted that her migraines were recurrent and uncontrolled, even after seeing a neurologist, and that she wanted a referral to pain management, which he provided. AR 633. Thereafter, on February 2, 2012, Dr. Win examined Plaintiff after she claimed that she had passed out due to a migraine attack and went to the St. Rose

Emergency Department for treatment. AR 632. Contrary to Defendant's argument, a comprehensive review of Dr. Win's treatment notes actually indicate that Plaintiff's migraines were getting worse.

Irrespective of how these records may reflect on Plaintiff's credibility, any reliance on them is improper, because those records were not cited in the ALJ's decision nor were they relied upon by any testifying experts. Accordingly, these additional reasons offered by Defendant to find Plaintiff not credible must be disregarded in this proceeding.

**D. The hypothetical posed by the ALJ was incomplete.**

Plaintiff argues that the ALJ erred by relying on vocational expert ("VE") testimony based on a hypothetical that did not include all of Plaintiff's severe limitations to find that Plaintiff was not disabled. (Pl.'s Mot. at 23-24.)

After finding that Plaintiff had no past relevant work at step four of the sequential disability analysis, the burden shifted to the ALJ to demonstrate that Plaintiff is not disabled and can engage in work that exists in significant numbers in the national economy. *Hill v. Astrue*, 698 F.3d 1153, 1161 (9th Cir. 2012). The ALJ may meet this burden at step five by "asking a vocational expert a hypothetical question based on medical assumptions supported by substantial evidence in the record and reflecting all of the claimant's limitations, both physical and mental, supported by the record." *Id.*

If the ALJ's question to a VE fails to include all of the impairments from which the claimant suffers, then the expert's testimony cannot constitute substantial evidence upon which to base a conclusion that the claimant is not entitled to benefits. *Id.* at 1162. The ALJ's RFC included Plaintiff's "difficulties with memory, completing tasks, concentration, and understanding," as well as fatigue, sleep difficulties, and irritability. AR 46. The ALJ, however, discounted Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms" because they were not credible, which formed the basis of his finding that "claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: she is limited to simple, routine, and repetitive tasks involving only simple work related decision and with few, if any, workplace changes." AR 45-46. Thus, at the hearing, the ALJ asked the VE whether jobs exist in the national economy for "an individual who is able to perform at all exertional levels, but that work is limited to simple, routine, and repetitive tasks involving only simple

work-related decisions with few if any work place changes." AR 87. The VE responded that such unskilled positions existed, including that of hand packager and cafeteria attendant. *Id.* The ALJ then asked what the effect of Plaintiff's purported migraines would be if that "translate[d] into absences or inabilities to complete a full work day" on her ability to maintain employment. AR 87-88. The VE responded that unexcused absences of more than one day per month would make her uncompetitive. AR 88.

At the hearing, Plaintiff's counsel asked the VE whether a person with "at least a 10 percent limitation in being around people and being able to interact with people" would be able to perform those unskilled jobs.[2] AR 89. The VE responded that the 10 percent limitation would constitute a moderate impairment and would preclude employment, because there would be behavioral problems in positions that require public contact and supervisor and coworker interaction. *Id.*

The RFC used in the hypothetical did not include all of Plaintiff's limitations, particularly Plaintiff's psychotic disorder. While the ALJ asked a follow-up question about the effect of Plaintiff's migraines, he ignored the VE's opinion that absences of more than one day per month would preclude employment. Further, the ALJ did not consider the VE's testimony regarding the effect of a moderate functional limitation in being around people on Plaintiff's employment prospects. Accordingly, the VE's testimony does not support the ALJ's non-disability finding.

## V. CONCLUSION

For the reasons explained above, Plaintiff's motion for summary judgment is GRANTED, and this action is REMANDED to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g), for further proceedings consistent with this order.

The Clerk of the Court shall close this case.

IT IS SO ORDERED.

DATE: January 24, 2014

KANDIS A. WESTMORE
United States Magistrate Judge

[2] Plaintiff's counsel conservatively asked for a 10 percent limitation based on her assessment by Dr. Rahman, which found that Plaintiff had extreme limitations in her ability to interact appropriately with the general public and work with others. (Pl.'s Mot. at 24; AR 363-365.)